UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 25-cv-60771-ALTMAN

**S.W.**,

  *Plaintiff*,

*v.*

**TROPICAL PARADISE RESORTS,
LLC**, *et al.*,

  *Defendants.*

_____/

## <u>ORDER ON MOTION TO DISMISS</u>

The Defendant has filed a Motion to Dismiss the Plaintiff's Amended Complaint (the "MTD")

[ECF No. 45]. Having carefully reviewed the briefing, the record, and the governing law, we now

**DENY** the Defendant's Motion to Dismiss.

## THE FACTS[1]

S.W., our Plaintiff, "was sex trafficked at the Rodeway Inn & Suites located at 2440 West State

Road 84, Fort Lauderdale, FL 33312 [(the 'Hotel')] between 2019 and 2020." Amended Complaint

[ECF No. 19] ("AC") ¶ 24. Defendant Tropical Paradise Resorts, LLC ("Tropical") owned the Hotel,

*see id.* ¶ 25; Defendant EZ Hospitality, LLC ("EZ") was the "manager and operator of" the Hotel, *id.*

¶ 26; and Defendant Choice Hotels International, Inc. ("Choice") was the "the franchisor and

branding/licensing entity" for the Hotel, *id.* ¶ 27. Choice "licensed its brand, imposed operational

---

[1] We accept the allegations of the Amended Complaint [ECF No. 19] as true for purposes of this Order. *See Dusek v. JPMorgan Chase & Co.*, 832 F.3d 1243, 1246 (11th Cir. 2016) ("In deciding a Rule 12(b)(6) motion to dismiss, the court must accept all factual allegations in a complaint as true and take them in the light most favorable to plaintiff, but 'legal conclusions without adequate factual support are entitled to no assumption of truth.'" (quoting *Mamani v. Berzain*, 654 F.3d 1148, 1153 (11th Cir. 2011) (cleaned up))).

standards, and exercised control over key aspects of the [Hotel's] operations, including but not limited to online reservations, employee training, and quality assurance protocols, and therefore held out the subject hotel as a branded public lodging under its national franchise system." *Ibid.* The Defendants "collectively exercised ownership, management, operational, and/or branding control" over the Hotel. *Id.* ¶ 28.

Starting in 2019, Steven Charles Joseph ("Joseph" or the "Trafficker") "began listing" the Plaintiff on "websites such as Independent Girls, Eros, and Adult Search." *Id.* ¶ 35. "Initially," the Plaintiff "agreed to [ ] Joseph being her 'pimp' and [he] paid S.W. for the sex work she performed." *Ibid.* But that quickly changed. *See id.* ¶ 36. Joseph "stopped paying S.W. and began to beat her and threaten her family" and "her own life." *Id.* ¶¶ 36–37. He then "held S.W. captive through beatings, threats of violence, isolation, withholding food, and other cruel acts[.]" *Id.* ¶ 36. From 2019 until the end of 2020, while S.W. was at the Hotel, Joseph "forced S.W. to perform sexual acts on countless individuals who sought sexual encounters in exchange for a fee," *id.* ¶ 42, and "used [S.W.] for his sex trafficking operation," which he ran out of the Hotel, *id.* ¶ 36.

While she was being trafficked at the Hotel, "S.W. was subject to repeated instances of rape, physical abuse, verbal abuse, exploitation, psychological torment, kidnapping, and false imprisonment[.]" *Id.* ¶ 43. "S.W. was forced into sexual encounters with upwards of five (5) to six (6) Johns per night, and these Johns would enter and leave the [Hotel] in revolving door fashion with no luggage or personal items to suggest that they were guests of the hotel." *Id.* ¶ 52. And this wasn't a one-day or short-term operation. Rather, "Joseph operated the sex trafficking venture out of the same hotel rooms at the [Hotel] for multiple days or weeks in succession." *Id.* ¶ 53. He "also booked 'day rooms' for multiple hours." *Ibid.*

Joseph "paid cash or via card for the hotel rooms that were used" to traffic the Plaintiff. *Id.* ¶ 48. Joseph "would arrive to [the Hotel] with S.W. and sometimes upwards of twenty (20) other sex trafficking victims, who were scantily dressed." *Ibid.* "On numerous occasions at the [Hotel], [] Joseph routinely escorted [the Plaintiff], who was visibly drunk and scantily clothed, in plain view of the front desk after [] Joseph paid in cash for the rooms[.]" *Id.* ¶ 56. The Plaintiff "observed some of the same [H]otel staff over the course of time she was trafficked for sex at the [Hotel], and the [H]otel staff did nothing to stop or prevent the ongoing" sex trafficking. *Id.* ¶ 59. That's because "Joseph befriended the staff and security personnel that worked at the [Hotel], and the [H]otel staff knew that [] Joseph was forcibly prostituting S.W. on the premises." *Id.* ¶ 57. The "Defendants' agents, employees, and servants made promises to" Joseph that they would "not interfere with" the Plaintiff. *Id.* ¶ 111. Indeed, "some of the Johns" who visited the Hotel and the Plaintiff were "staff, agents and/or employees of [the] Defendants[.]" *Id.* ¶ 114.

The Plaintiff and "other sex trafficking victims would also frequent the [adjoining] Marina 84 Sports Bar & Grill [(the 'Restaurant')] to pick up and/or wait for Johns[.]" *Id.* ¶ 51. Not only did Joseph rent rooms at the Hotel, but he "partnered with other local 'pimps' to host sex parties at the lobby of the [Hotel] and [the Restaurant], where Johns were then taken into the hotel rooms by S.W. and other victims of sex trafficking." *Id.* ¶ 49. "Multiple staff members of the [Hotel] were present at these parties, and all were aware of the purpose of these parties—to make as much money as possible from the 'Johns[.]'" *Ibid.* For these "sex parties," Joseph and "the other local 'pimps' would rent out the [Restaurant] for food and drinks." *Id.* ¶ 50. "The parties were advertised on multiple websites, so the Johns knew where to go for the sex parties." *Ibid.* During the "sex parties," the Plaintiff "and the other sex trafficking victims would take the Johns from the [R]estaurant into the lobby of the [Hotel], and then rented rooms to forcibly perform sex acts for the 'Johns.'" *Ibid.*

Israel "Izzy" Fintz was "the hotel manager and Title Manager of [the] Defendant EZ[.]" *Id.* ¶ 58. Fintz "was not only aware of the trafficking occurring on the premises but actively participated in and profited from it." *Id.* ¶ 142. "Fintz received monetary kickbacks or 'cuts' from traffickers, including [ ] Joseph, in exchange for permitting continued trafficking operations at the [H]otel." *Ibid.* "These incentives included payments per room rented and, in some cases, per trafficking victim." *Ibid.* Fintz also specifically interacted with the Plaintiff. He would "frequently invite[ ] S.W. into his office, where he would flirt with her and give her complimentary drink cards for the [Restaurant]." *Ibid.* During these interactions, Fintz "repeatedly asked S.W. to go on 'dates' with him." *Id.* ¶ 146. On one occasion, Fintz "abruptly entered the room" in which the Plaintiff was being trafficked to a John. *Id.* at 58. Fintz then "complain[ed] of marijuana smell and demand[ed] additional payment [from the Plaintiff] for the room due to the smell." *Ibid.*

But the Plaintiff's relationship with Fintz would soon change. One night, "a John who regularly paid for sex acts with [the Plaintiff] entered the [Hotel] lobby in a jealous rage and loudly accused [ ] Fintz of sleeping with" the Plaintiff. *Id.* ¶ 150. After this incident, Fintz told the Plaintiff that "he had been forced to hold a staff meeting about the incident" and that he had "assure[d] his employees that he did not have a sexual relationship with" the Plaintiff. *Id.* ¶ 151. From that point on, Fintz *still* "invited [her] into his office and regularly provided her with free drink cards," but he stopped asking her on "dates." *Id.* ¶ 152.

In late 2020, the Plaintiff escaped Joseph's sex-trafficking operation. On April 21, 2025, the Plaintiff sued the Defendants under the Trafficking Victims Protection Reauthorization Act, 18 U.S.C. § 1591 (the "TVPRA"), and the common law of premises liability. *See* Complaint [ECF No. 1]. The Plaintiff filed her Amended Complaint on June 23, 2025, alleging two counts under the TVPRA— one for "perpetrator liability," AC ¶¶ 207–21 (Count I), and a second for "beneficiary liability," *id.*

¶¶ 221–34 (Count II)—and one negligence count under the common law of premises liability, *see id.* ¶¶ 235–53 (Count III). On August 4, 2025, this case was reassigned to us. *See* Order Reassigning Case [ECF No. 34]. The Defendants have since moved to dismiss all counts. *See generally* MTD. That Motion is now ripe for resolution. *See* Plaintiff's Response [ECF No. 53]; Defendant's Reply [ECF No. 58].

## THE LAW

### I.    Motion to Dismiss

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). To meet this "plausibility standard," a plaintiff must "plead[ ] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). The standard "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* (quoting *Twombly*, 550 U.S. at 555). "[T]he standard 'simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence' of the required element." *Rivell v. Private Health Care Sys., Inc.*, 520 F.3d 1308, 1309–10 (11th Cir. 2008) (quoting *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678. On a motion to dismiss, "the court must accept all factual allegations in a complaint as true and take them in the light most favorable to plaintiff." *Dusek v. JPMorgan Chase & Co.*, 832 F.3d 1243, 1246 (11th Cir. 2016).

### II.    Liability under the TVPRA, 18 U.S.C. § 1595

"The Trafficking Victims Protection Reauthorization Act, 18 U.S.C. § 1591, prohibits the sex trafficking of children or adults by force, fraud, or coercion." *Doe #1 v. Red Roof Inns, Inc.*, 21 F.4th

714, 723 (11th Cir. 2021);[2] *see also United States v. Concepcion*, 139 F.4th 242, 246 (2d Cir. 2025) (Park, J.) ("The TVP[R]A aimed to combat trafficking in persons, a contemporary manifestation of slavery whose victims are predominantly women and children, to ensure just and effective punishment of traffickers, and to protect their victims." (cleaned up)). In 2003, "Congress gave victims of sex trafficking the power to bring civil actions to recover damages from those who trafficked them"— what we now call "perpetrator liability" claims. *G.G. v. Salesforce.com, Inc.*, 76 F.4th 544, 548, 552 (7th Cir. 2023) (citing § 1595 (2003)). "In 2008, Congress broadened that civil remedy to allow what we will call 'participant liability.'" *Id.* at 548 (citing § 1595(a) (2008)). In other words, "the Act provides sex-trafficking victims with a civil cause of action against 'the perpetrator (or whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter).'" *Red Roof*, 21 F.4th at 723 (citing § 1595(a)); *see also Salesforce*, 76 F.4th at 548 ("The amendment allows victims to recover damages not only from a trafficker who committed a federal crime but also from a person who

---

[2] Section 1591(a) of the Act imposes criminal liability for certain sex-trafficking acts:

(a) Whoever knowingly--
> (1) in or affecting interstate or foreign commerce, or within the special maritime and territorial jurisdiction of the United States, recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits by any means a person; or
> (2) benefits, financially or by receiving anything of value, from participation in a venture which has engaged in an act described in violation of paragraph (1), knowing, or, except where the act constituting the violation of paragraph (1) is advertising, in reckless disregard of the fact, that means of force, threats of force, fraud, coercion described in subsection (e)(2), or any combination of such means will be used to cause the person to engage in a commercial sex act, or that the person has not attained the age of 18 years and will be caused to engage in a commercial sex act, shall be punished as provided in subsection (b).

18 U.S.C. § 1591(a).

'knowingly benefits . . . from participation in a venture which that person knew or should have known has engaged in an act' of sex trafficking."). Victims of sex trafficking can therefore assert *both* perpetrator- *and* participant-liability claims. *See Doe #1 v. MG Freesites, LTD*, 676 F. Supp. 3d 1136, 1150 (N.D. Ala. 2022) (Coogler, J.) ("That provision of the TVPRA permits a party to bring a civil claim against perpetrators of sex trafficking and against persons or entities who, although not the direct perpetrator, knowingly benefitted from participating in what they knew or should have known was a sex trafficking venture.").

**ANALYSIS**

### I.      Vicarious Liability

The Plaintiff asks us to impute Fintz's knowledge and actions to all three Defendants. *First*, as to Tropical (the Hotel operator), the Plaintiff alleges that "Fintz also served as the on-site hotel manager of the [Hotel], where he exercised operational authority over [H]otel staff, guest services, access control, security, and other daily operations." AC ¶ 139. "In this capacity," the Plaintiff says, "Fintz acted as the actual and/or implied agent of [Tropical], which owned the [H]otel property and delegated management responsibilities to him." *Ibid. Second*, the Plaintiff wants us to impute Fintz's knowledge and conduct to EZ (the Hotel owner) because, "[a]s the only formal officer or manager listed for EZ, [Fintz's] acts and omissions are legally attributable to EZ under agency and corporate veil-piercing principles." *Id.* ¶ 138. *Third*, the Plaintiff argues that "Fintz operated with the apparent authority of [Choice], by enforcing brand policies, wearing branded uniforms, implementing reservation and property systems dictated by Choice," and "responding to complaints or inspections within the Choice Hotels network." *Id.* ¶ 140. "In doing so," the Plaintiff adds, "he acted on behalf of and within the scope of Choice's retained operational control." *Ibid.* According to the Plaintiff, in

7

other words, Fintz was the "actual and/or apparent agent of all of [the] Defendants, including Choice[.]" *Id.* ¶ 146.

Neither Tropical nor EZ oppose the Plaintiff's request that we impute Fintz's knowledge and actions to them. *See generally* MTD. They've "thus forfeited (at least for now) any argument [they] might have advanced as to [that] element[.]"*Amaya v. Vilsack*, 2024 WL 3509583, at *5 (S.D. Fla. July 23, 2024) (Altman, J.) (first quoting *United States v. Campbell*, 26 F.4th 860, 873 (11th Cir. 2022) ("[F]ailure to raise an issue in an initial brief . . . should be treated as a forfeiture of the issue, and therefore the issue may be raised by the court sua sponte [only] in extraordinary circumstances."); then quoting *Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1319 (11th Cir. 2012) ("[T]he failure to make arguments and cite authorities in support of an issue waives it."); and then quoting *In re Egidi*, 571 F.3d 1156, 1163 (11th Cir. 2009) ("Arguments not properly presented . . . are deemed waived.")).

Choice, however, *does* offer a cursory objection to this imputation. As Choice sees it, the "Plaintiff's allegation that Israel Fintz, the purported manager of the Hotel, was vested with 'apparent authority' by Choice fails because the allegations provided to support this conclusory claim are nothing more than the presence of 'brand policies, branded uniforms, implementing reservation and property systems dictated by Choice, and responding to complaints or inspections within the Choice Hotels network.'" MTD at 8 (quoting AC ¶ 140). We disagree.

Choice "confuse[s] pleading with proof. At the motion-to-dismiss stage, we take the plaintiff's well-pleaded allegations as true." *Vargas v. Lincare, Inc.*, 134 F.4th 1150, 1159 (11th Cir. 2025). "[D]etermination of the existence of an agency relationship is a factual question." *Polo Ralph Lauren, L.P. v. Tropical Shipping & Const. Co., Ltd.*, 215 F.3d 1217, 1224 (11th Cir. 2000). "And factual disputes are not grounds for dismissal at this stage." *Vargas*, 134 F.4th at 1160; *see also Woodley v. Royal Caribbean Cruises, Ltd.*, 472 F. Supp. 3d 1194, 1207 (S.D. Fla. 2020) (Moore, C.J.) ("Because the question of

8

whether an agency relationship exists is a question of fact, whether a plaintiff reasonably believes that an agency relationship exists is also a question of fact which cannot be decided on a motion to dismiss." (cleaned up)). So, while Choice "may ultimately be correct" that a reasonable person wouldn't have believed that Fintz was acting with Choice's apparent authority, "discovery will be necessary to elucidate the relevant facts." *J.G. v. Northbrook Indus., Inc.*, 619 F. Supp. 3d 1228, 1237 (N.D. Ga. 2022) (Geraghty, J.) (denying motion to dismiss where the defendant "contends that, to the extent [its] employees took part in a common enterprise with [the] [p]laintiff's sex traffickers, such conduct was outside the scope of their employment and cannot be imputed to [the defendant]").

Since we must accept, at this early stage of the case, the Plaintiff's allegation that Fintz acted as the agent of all three Defendants, we'll impute his actions and knowledge to all of them. *See Liquidation Comm'n of Banco Intercont'l, S.A. v. Renta*, 530 F.3d 1339, 1355 (11th Cir. 2008) (holding that "corporations act only through their agents, and an agent's guilty conduct and knowledge is typically imputed to his principal," so that "[o]nce the agent's knowledge and conduct are imputed to the corporation, the corporation is considered a wrongdoer").

## II. Count II: Beneficiary Liability under the TVPRA

In Count II, the Plaintiff asserts claims of beneficiary liability under the TVPRA against all three Defendants. *See* AC ¶¶ 222–34. According to the Plaintiff, the "Defendants knowingly participated in a venture with [her] trafficker, Joseph, by repeatedly renting rooms to him and providing services used to carry out the trafficking, while continuing to financially benefit." *Id.* ¶ 227. The Plaintiff alleges that the "Defendants knowingly benefited from their respective participation in a venture that subjected [her] to repeated sex trafficking in violation of 18 U.S.C. § 1591." *Id.* ¶ 224.

"Our analysis begins with the text of the civil remedy provision of the TVPRA, which provides that a sex trafficking victim may bring a civil action for damages against the perpetrator 'or whoever

knowingly benefits, or attempts or conspires to benefit, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter.'" *K. H. v. Riti, Inc.*, 2024 WL 505063, at *2 (11th Cir. Feb. 9, 2024) (quoting § 1595(a)). In this count, the Plaintiff brings "a claim against a party that allegedly 'knowingly benefited' or 'attempted or conspired' to benefit from sex trafficking." *Ibid.*; *see also* AC ¶ 224 ("[The] Defendants knowingly benefited from their respective participation in a venture that subjected [the] Plaintiff to repeated sex trafficking[.]"). "These types of claims under the TVPRA are known as beneficiary claims." *K.H.*, 2024 WL 505063, at *2. A TVPRA beneficiary claim has four elements:

> [T]o state a beneficiary claim under Section 1595(a), a plaintiff must plausibly allege that the defendant (1) knowingly benefited, (2) from taking part in a common undertaking or enterprise involving risk and potential profit, (3) that undertaking or enterprise violated the TVPRA as to the plaintiff, and (4) the defendant had constructive or actual knowledge that the undertaking or enterprise violated the TVPRA as to the plaintiff.

*Red Roof*, 21 F.4th at 726. The Plaintiff has met each of these elements.

### a. The First Element: The Defendants Knowingly Benefitted

A plaintiff must first allege that the defendant "knew it was receiving some value from participating in the alleged venture." *Id.* at 724; *see also ibid.* (explaining that "[k]nowledge is an awareness or understanding of a fact or circumstance; a state of mind in which a person has no substantial doubt about the existence of a fact").

According to the Plaintiff, the "Defendants knowingly participated in a venture with Plaintiff's trafficker, [Joseph], by repeatedly renting rooms to him and providing services used to carry out the trafficking, while continuing to financially benefit." AC ¶ 227. The Plaintiff alleges that EZ and Tropical received "[r]ental income and increased room occupancy," "[s]ales of food, beverages, and ATM fees," and "[a]dditional revenue derived from services and amenities used by sex buyers and traffickers." *Id.* ¶ 225.

All this, EZ and Tropical say, isn't enough. In their view, "[t]o meet the 'knowingly benefitted' element under § 1595(a), [the] Plaintiff must do more than allege that Tropical [and EZ] received payment for rooms." MTD at 21; *see also id.* at 25 ("To meet the 'knowingly benefitted' element under § 1595(a), [the] Plaintiff must do more than allege that EZ profited from general [H]otel operations."). "She must," they insist, "plausibly allege that Tropical [and EZ] received a financial benefit *because of* [their] knowing participation in a trafficking venture." *Id.* at 21. For two reasons, we find that the Plaintiff has plausibly alleged that EZ and Tropical "knew [they were] receiving some value from participating in the alleged venture." *Red Roof*, 21 F.4th at 724.

*First*, "district courts, including" courts in our Circuit, "have found that the rental of a room constitutes a financial benefit from a relationship with the trafficker sufficient to meet this element of the § 1595(a) standard." *J.G.*, 619 F. Supp. 3d at 1234 (first citing *A.G. v. Northbrook Indus., Inc.*, 2022 WL 1644921, at *2 (N.D. Ga. May 24, 2022) (Boulee, J.); then citing *G.W. v. Northbrook Indus., Inc.*, 2022 WL 1644923, at *2 (N.D. Ga. May 24, 2022) (Boulee, J.); then citing *M.A. v. Wyndham Hotels & Resorts, Inc.*, 425 F. Supp. 3d 959, 965 (S.D. Ohio 2019); and then citing *S.Y. v. Naples Hotel Co.*, 476 F. Supp. 3d 1251, 1257 (M.D. Fla. 2020) (Steele, J.) (collecting cases)); *see also B.W. v. G6 Hosp. Prop. LLC*, 2025 WL 3557926, at *3 (N.D. Ga. Feb. 11, 2025) (Boulee, J.) ("This Court finds that the revenue from the room rental constitutes a financial benefit sufficient to meet the 'knowingly benefited' standard."); *A.D. v. Choice Hotels Int'l, Inc.*, 2023 WL 3004547, at *3 (M.D. Fla. Apr. 19, 2023) (Steele, J.) (finding the first prong satisfied where the defendant "benefits financially from room rentals and other incidentals recognized by renting rooms in which the Plaintiff was sex trafficked"). And this makes sense because, as the Eleventh Circuit has explained, § 1591(a) requires proof that a defendant "knew it was receiving *some value* from participating in the alleged venture." *Red Roof*, 21 F.4th at 724 (emphasis added). This requirement comes straight from the text of the statute, which prohibits

anyone from "benefit[ting], financially or by receiving *anything of value*, from participation in a venture[.]" § 1591(a) (emphasis added). Since a room rental obviously constitutes something of value to a hotel, we'll join our fellow judges and find that "room rental constitutes a financial benefit sufficient to meet the 'knowingly benefited' standard." *G6*, 2025 WL 3557926, at *3.

*Second*, the Defendants misread the Amended Complaint. They argue that the Plaintiff "does not allege that the [H]otel's financial gain was dependent on, or driven by, trafficking activity." MTD at 23. "Nor does she allege," they insist, that Tropical and EZ "undertook any action to promote, facilitate, or encourage trafficking in order to realize financial gain." *Ibid.* But that's *exactly* what she alleges. For instance, she claims that her pimp "partnered with other local 'pimps' to host sex parties at the lobby of the [Hotel] and the [Restaurant], where Johns were then taken into the hotel rooms by [the Plaintiff] and other victims of sex trafficking"—all while "[m]ultiple members of the [Hotel] were present at these parties and aware of the purpose of these parties[.]" AC ¶ 49. This is, standing alone, enough to plausibly show that the Defendants *knowingly* benefitted from the sex trafficking. But that's not all. The Plaintiff also avers that the Defendants were *purposefully* aiding the sex trafficking by renting the traffickers rooms "in close proximity to each other and in proximity to the stairwells and exits[.]" AC ¶ 118. Plus, the Plaintiff alleges that the hotel manager (Fintz)—who was deeply embedded with the trafficking and whose conduct we can (at this stage) impute to the Defendants—"received cuts from room rentals associated with trafficking victims." AC ¶ 142. For all these reasons, the Plaintiff has plausibly alleged that EZ and Tropical "knowingly benefited" from the trafficking.

### b. The Second Element: The Defendants' Participation

In evaluating the second element, we must determine whether Tropical and EZ participated in the sex-trafficking venture. In the context of a civil suit, the Eleventh Circuit has defined

"participation in a venture" as "t[aking] part in a common undertaking or enterprise involving risk and potential profit." *Red Roof*, 21 F.4th at 726.

To assess whether conduct constitutes "participation in a venture," we look to the Eleventh Circuit's analysis in *Red Roof*, where the plaintiffs—sex-trafficking victims—sued the franchisors of the hotels at which they were trafficked. *Id.* at 719. Arguing that the franchisors participated in the sex-trafficking venture, the plaintiffs alleged that the franchisors received revenues from renting rooms to the sex traffickers, oversaw operations and hotel policies, controlled the training of managers, and "took remedial action when revenue was down." *Id.* at 726–27. But their *only* allegations about the franchisors' participation in the sex-trafficking venture were their claims that "the franchisors sent inspectors to the hotels who would have seen signs of sex trafficking" and "received reviews mentioning sex work occurring at the hotels." *Id.* at 727. The Eleventh Circuit deemed these cursory—and indirect—allegations insufficient to establish the franchisors' *participation* in the scheme because "observing something is not the same as participating in it." *Ibid.*

Recognizing that interpreting a beneficiary claim under the TVPRA was an issue of first impression in our Circuit, the court also provided some clues about the kinds of conduct that, if alleged, *would* pass muster under the TVPRA. In doing so, the court endorsed the First Circuit's reasoning in *Ricchio v. McLean*, 853 F.3d 553 (1st Cir. 2017) (Justice Souter), where a sex-trafficking victim sued the operators of the hotel in which she was held hostage and sexually abused. In *Ricchio*, the First Circuit concluded that the plaintiff *had* adequately alleged the hotel operators' participation in the sex-trafficking venture, in part, because the plaintiff's abuser "had prior commercial dealings with the [operators], which the parties wished to reinstate for profit," and because the plaintiff alleged that, by renting a room to her abuser, the hotel operators were "associating with him in an effort to force [the plaintiff] to serve their business objective." *Id.* at 555. Describing the facts of *Ricchio*, the

Eleventh Circuit in *Red Roof* opined that "these kinds of allegations *would* establish a hotel operator's participation in a venture with a sex trafficker." *Red Roof*, 21 F.4th at 726 (emphasis added).

EZ and Tropical contend that the Plaintiff fails this second element because she "does not allege that EZ [or Tropical] collaborated with her trafficker, coordinated with him to carry out trafficking, or shared in any of his profits." MTD at 24. In their view, the Complaint does little more than suggest "that [H]otel employees may have observed indicators of suspicious conduct—such as [ ] Joseph renting rooms, cash payments, or the presence of multiple women." *Id.* at 20 (citing AC ¶¶ 105–37). And, they say, "'observing something is not the same as participating in it.'" MTD at 20 (quoting *Red Roof*, 21 F.4th at 727).

In saying so, however, EZ and Tropical ignore many of the Amended Complaint's well-pled allegations. We'll highlight the four sets of allegations we think EZ and Tropical have missed. *First*, the Plaintiff repeatedly alleges that Fintz (an alleged agent of EZ and Tropical) knew all about the sex trafficking, facilitated the sex trafficking, and then shared in the sex-trafficking profits. *See, e.g.*, AC ¶ 217 ("[Fintz] received monetary incentives from traffickers, including per-room and per-victim cuts, and attempted to traffic [H]otel employees himself. These actions were undertaken in the scope of his duties and with the actual or apparent authority granted to him by each Defendant."). She also claims that Fintz "received monetary kickbacks or 'cuts' from traffickers, including Joseph, in exchange for permitting continued trafficking operations at the [H]otel," and that "[t]hese incentives included payments per room rented and, in some cases, per trafficking victim." *Id.* ¶¶ 142, 145.

*Second*, the Hotel "host[ed] sex parties at the lobby" and in the Restaurant. *Id.* ¶ 49. And the Plaintiff says that "[m]ultiple staff members . . . were present at these parties and all were aware of the

14

purpose of these parties[.]" *Ibid.*[3] Hosting and participating in "sex parties" in the lobby and Restaurant

of the Hotel is a far cry from the mere observations and room rentals at issue in *Red Roof* and strongly

suggests "a common undertaking involving risk or profit." *Red Roof*, 21 F.4th at 727.

*Third*, the Plaintiff alleges that the Defendants ignored blatant "signs of sex trafficking" at the

Hotel, including "an excess of condoms in rooms, individuals carrying or flashing large amounts of

cash, renting two rooms next door to each other, declining housekeeping service for several

consecutive days, significant foot traffic in and out of rooms, men traveling with multiple unrelated

women, guests checking in with little or no luggage, hotel guests who prevent another individual from

speaking for themselves, or a guest controlling another's identification documents." AC ¶ 80. They

ignored all this, the Plaintiff alleges, because they (through Fintz) were actively participating in the sex

trafficking.

*Fourth*, according to the Amended Complaint, the Hotel purposefully—that is, with an eye

toward facilitating the trafficking—rented the traffickers rooms that were "in close proximity to each

other and in proximity to the stairwells and exits[.]" *Id.* ¶ 118; *see also* Resp. at 14 ("Rooms were rented

to [Joseph] . . . near stairwells or exits at his request . . . [to] create[ ] the conditions necessary for

trafficking to persist undisturbed."). This, again, is far more involvement than merely "observing" the

trafficking and extends well beyond anything the *Red Roof* Plaintiffs had pled. Indeed, federal judges

routinely find that a "hotel manager/operator participated in a venture where hotel staff

accommodated traffickers' preferred room locations, developed a relationship with the traffickers, and

repeatedly allowed disruptive behavior without consequences." *J.G.*, 619 F. Supp. 3d at 1237; *see also*

*ibid.* ("Plaintiff's allegations—namely, that Northbrook employees were paid to assist Plaintiff's sex

---

[3] The Defendants notably fail to address this allegation in either their MTD or their Reply. They've thus forfeited, for now, any answer they could've mustered to its probity.

traffickers by acting as lookouts, and that Northbrook previously rented rooms to Plaintiff's sex traffickers and rented to them again despite having constructive knowledge of their intent to traffic Plaintiff—go far beyond mere observation of potential sex trafficking."); *G6*, 2025 WL 3557926, at *3 ("Plaintiff contends that the Defendant's employees knew and befriended Plaintiff's trafficker and informed him of potential police patrols or other unwanted attention. Those allegations demonstrate participation in a venture."); *S.Y. v. Best W. Int'l, Inc.*, 2021 WL 2315073, at *4 (M.D. Fla. June 7, 2021) (Steele, J.) (denying motion to dismiss where the plaintiff alleged that the defendants participated in a sex-trafficking venture by renting rooms to people it knew or should have known were engaged in sex trafficking); *Riti*, 2024 WL 505063, at *4 n.6 (holding that participation in the sex-trafficking venture can be shown by allegations that "hotel employees worked directly with traffickers by providing lookouts in exchange for cash or drugs" (citing *Red Roof*, 21 F.4th at 720)); *A.R.J. v. Wyndham Hotels & Resorts, Inc.*, 2024 WL 4224915, at *9 (W.D. Tex. Aug. 30, 2024) (noting that "participation in a hotel-operating venture qualifies as participation in a venture under Section 1595(a) when the hotel operates in a manner that facilitates sex trafficking" and finding that the plaintiff had stated a claim for beneficiary liability against the franchisee where she alleged "that the traffickers developed a relationship with employees at the hotel" and "that the hotel employees accommodated specific requests made by the traffickers"); *A.D. v. Best W. Int'l, Inc.*, 2023 WL 5510064, at *4 (M.D. Fla. Aug. 25, 2023) (Steele, J.) ("The fact that Trafficker 2 spent all day loitering around the parking lot without consequences and that a 'procession of men' who were not registered guests were openly going into a room support[ed] participation in the venture."); *Doe v. Wyndham Hotels & Resorts, Inc.*, 2025 WL 824369, at *12 (S.D. Cal. Mar. 14, 2025) (finding that the plaintiff's "allegations amount to more than a failure to affirmatively prevent and police sex trafficking" where the plaintiff alleged that "the Franchisee Defendants facilitated the sex trafficking activity" by "developing 'familiar relationships

with traffickers,' 'accommodating specific requests such as requests regarding preferred room locations,' and creating an 'implicit understanding' that enabled the traffickers 'to operate freely without expending significant resources on concealment, as they had found venues where they could conduct their operations without disruption'"); *C.S. v. Wyndham Hotels & Resorts, Inc.*, 2021 WL 1264226, at *5 (M.D. Fla. Apr. 6, 2021) (Steele, J.) (concluding that "[r]equests by the traffickers to rent rooms near exit doors" suggested that the hotel owner and operator participated in the sex-trafficking venture). The Plaintiff, in short, has plausibly alleged that EZ and Tropical participated in the sex-trafficking venture.

One more thing on this second element: As Judge Jordan explained in his *Red Roof* concurrence, the *Red Roof* test only "addresses the plaintiffs' TVPRA 'beneficiary' claims against franchisors, which do not operate or manage the hotels at which sex trafficking allegedly occurred." *Red Roof*, 21 F.4th at 729. In Judge Jordan's view, however, TVPRA claims "against those who own, operate, or manage the hotels in question . . . *would* withstand a Rule 12(b)(6) motion to dismiss." *Id.* at 730 (emphasis added). In other words, in cases like *ours*, where a hotel owner, operator, or manager received revenue from knowingly renting rooms to sex traffickers, oversaw operations and hotel policies, controlled the training of managers, "sent inspectors to the hotels who would have seen signs of sex trafficking," "received reviews mentioning sex work occurring at the hotels," and "took remedial action when revenue was down," *id.* at 726–27, the allegations of the *Red Roof* Plaintiffs *would* have been sufficient to show that the defendant "took part in a common undertaking or enterprise involving risk and potential profit," *id.* at 727. Since that's precisely what our Plaintiff has alleged here, we think she's done enough to survive the MTD.

17

### c.  The Third Element: The Venture Violated the TVPRA as to the Plaintiff

To satisfy the third element, the Plaintiff must allege that "the venture in which the defendant participated and from which it knowingly benefited . . . violated the TVPRA as to the plaintiff." *Red Roof*, 21 F.4th at 725. She's easily met that burden. She alleges that she "is a victim of sex trafficking within the meaning of 18 U.S.C. § 1591[.]" AC ¶ 208. Specifically, she claims (and the Defendants do not dispute) that, from 2019 "until the end of 2020," her pimp "used her for his sex-trafficking operation at the [Hotel][.]" *Id.* ¶ 36. For good measure, she also gives us some detail about the forced nature of her sex trafficking. *See, e.g., id.* ¶ 43 ("S.W. was subject to repeated instances of rape, physical abuse, verbal abuse, exploitation, psychological torment, kidnapping, and false imprisonment[.]"); *id.* ¶ 52 ("S.W. was forced into sexual encounters with upwards of five (5) to six (6) Johns per night, and these Johns would enter and leave the [Hotel] in revolving door fashion with no luggage or personal items to suggest that they were guests of the hotel."). She's therefore satisfied the third element of her TVPRA beneficiary claim. *See J.G.*, 619 F. Supp. 3d at 1238 (finding that substantially similar allegations satisfied this third element).

### d.  The Fourth Element: The Defendants Knew or Should Have Known

The final element of a TVPRA beneficiary claim requires plaintiffs to plead that "the defendant had constructive or actual knowledge that the undertaking or enterprise violated the TVPRA as to the plaintiff." *Red Roof*, 21 F.4th at 726; *see also* § 1595(a) (requiring a showing that the defendant "knew or should have known [that the venture] has engaged in an act in violation of this chapter"). Knowledge in this context means "a[n] awareness or understanding of a fact or circumstance." *Red Roof*, 21 F.4th at 725 (quoting *Knowledge*, Black's Law Dictionary (11th ed. 2019)). Constructive knowledge, on the other hand, is "that knowledge which 'one using reasonable care or diligence should have.'" *Ibid.* (quoting *Constructive Knowledge*, Black's Law Dictionary (11th ed. 2019)). So, the Plaintiff

18

must plausibly allege that the Defendants had at least constructive knowledge that the venture in which they participated, and from which they knowingly benefited, violated the TVPRA. For all the reasons we've already outlined, our Plaintiff easily meets this standard.

The Amended Complaint alleges that the Plaintiff was "visibly injured, impaired, or fearful while escorted by Joseph" through the Hotel and in front of Hotel employees, that "[m]ultiple men per day [were] coming and going from the same rooms without luggage or personal possessions," that "[e]xcessive requests for towels and linens [were made] in the rooms," that "[e]xcessive used condoms [were] located in the rooms," that there was a general "[r]efusal of housekeeping services by those persons engaged in sex trafficking," and that there was an outpouring of "[o]nline guest reviews referencing prostitution[.]"[4] AC ¶ 229. Plus, the Plaintiff claims that Fintz "facilitated trafficking on

---

[4] According to the Amended Complaint, online reviews of the Hotel regularly suggested that sex trafficking was taking place there. *See* AC ¶ 104. One review observed that the Hotel "was pretty much a resort for prostitutes and drug addicts." *Ibid.* In response to another such review, Fintz responded: "It is unfortunate that this site allow this type of review from those who judge other people! UNAMERICAN! UNCONPASSIONATE!" *Ibid.* Another review (to which Fintz likewise responded) asserted that "[m]en seem to be hooking up with prostitutes in the lobby as well." *Ibid.* And yet another reported: "Finally got this young woman's attention through the window and she waved, said sorry, and dashed down the hall. I started wondering if she belonged to the multiple groups of women through the complex who had their doors wide open, getting dressed in lingerie?" *Ibid.*; *see also ibid.* ("Rowdy crowd, hotel more felt like a brothel."); *ibid.* ("There seemed to be drug deals going on in the far back parking lot. And a few ladies of the evening lingering there as well[.]"); *ibid.* ("We noticed what seemed to be a drug deal taking place in the far back lot and there were what seemed to be ladies of the evening at work in some of the rooms."); *ibid.* ("[T]he male staff kept making sexual remarks at the younger girls who were staying there saying that they 'are the best looking babes[.]'"); *ibid.* ("Hourly rate type of hotel. People were in the halls all night long. You can hear them in the room loud and clear."); *ibid.* ("[R]andom cars (all expensive cars with tinted windows) pull up with various people either staying in the car or coming out and leaving within a short time span[.]"); *ibid.* ("[T]here were people just hanging out in the side parking lot[.]"); *ibid.* ("[L]ots of people 'hanging' out in the corridors[.]"); *ibid.* ("The room was right next to the parking area. Lots of activity and noisy, with huge semi-trucks. There were half naked junkies yelling at each other outside the room, and it just didn't feel safe[.]"); *ibid.* ("Also groups of men hanging out in parking lot."); *ibid.* ("[W]oman kept screaming and at times I was worried for our safety."); *ibid.* ("People loitering, lotion in the room was out.").

Fintz responded to many of these reviews, suggesting (certainly at this stage of the case) that he had (at the very least) constructive knowledge of sex trafficking at the Hotel. And, because Fintz's

19

site, received cuts from room rentals associated with trafficking victims, and enabled sex and drug activity to flourish at the [H]otel." *Id.* ¶ 226. And (as we've highlighted) she says that the Hotel hosted "sex parties" in the lobby and the Restaurant, where "[m]ultiple staff members" were "present" and "aware of the purpose of these parties[.]" *Id.* ¶ 49. Courts considering similar allegations have found them plainly sufficient—at the motion-to-dismiss phase—to support a reasonable inference that a defendant knew or should have known that sex-trafficking was taking place. *See A.G.*, 2022 WL 1644921, at *4; *S.Y.*, 476 F. Supp. 3d at 1257 (collecting cases). The Plaintiff, in short, has sufficiently established the fourth element of her beneficiary claim.

***

We therefore **DENY** the Motion to Dismiss Count II.

### III.    Count I: Perpetrator Liability Under the TVPRA

In Count I, the Plaintiff asserts perpetrator-liability claims against all three Defendants under the TVPRA. *See* AC ¶¶ 207–21. Here, she alleges that the "Defendants knowingly harbored, maintained, and facilitated the trafficking of [the] Plaintiff [ ] and knowingly received financial benefits from this trafficking through room rentals, fees, and associated services." *Id.* ¶ 209. The TVPRA provides that "[a]n individual who is a victim of a violation of this chapter may bring a civil action against the perpetrator[.]" § 1595(a). A perpetrator under § 1595(a) is "someone who has violated the criminal statute." *Red Roof*, 21 F.4th at 724. To establish her claim, then, the Plaintiff "must . . . allege sufficient facts that [the Defendants] violated 18 U.S.C. § 1591(a)." *Doe v. Hotels*, 2024 WL 2955728, at *5 (M.D. Fla. June 12, 2024) (Sneed, J.); *see also B.J. v. G6 Hosp., LLC*, 2023 WL 6120682, at *11 (N.D. Cal. Sept. 18, 2023) ("'Civil perpetrator' liability under § 1595 adopts § 1591's 'elements for

---

knowledge can be imputed to the Defendants, the Plaintiff has plausibly alleged that they *too* had constructive knowledge of those activities.

criminal liability.'" (quoting *J.M. v. Choice Hotels Int'l, Inc.*, 2023 WL 3456619, at *2 (E.D. Cal. May 15, 2023))).

"Under § 1591(a)(1), the [plaintiff] first must show that the defendant knowingly recruited, enticed, harbored, transported, provided, obtained, or maintained a person by any means." *United States v. Rivera*, 558 F. App'x 971, 974 (11th Cir. 2014) (citing § 1591(a)(1)). "The [plaintiff] then must prove . . . that the defendant knew or was in reckless disregard of the fact that . . . means of force, threats of force, fraud, or coercion would be used to cause the person to engage in a commercial sex act." *Ibid.*[5] Again, the Plaintiff has sufficiently alleged that the Defendants knowingly harbored or maintained her with actual knowledge or reckless disregard of the fact that force, threats of force, or coercion would be used to induce her to engage in commercial sex acts.

As an initial matter, the Plaintiff alleges that the "Defendants knowingly harbored, maintained, and facilitated the trafficking of [the] Plaintiff[.]" AC ¶ 209. But facilitation doesn't create liability under § 1591(a). Rather, § 1591(a) applies to a defendant who "knowingly . . . recruits, entices, harbors,

---

[5] The Defendants argue that, "to make out her perpetrator claim (Count I), [the] Plaintiff must plausibly plead that Defendants violated the criminal prohibition on trafficking found in § 1591(a) in one of two distinct pathways, each requiring actual knowledge." MTD at 2. The Defendants then say that the Amended Complaint "never clearly identifies which of the two pathways forms the basis for her claim, often referencing both at the same time, while improperly (and, at times, incoherently) mixing and matching words and phrases from across § 1591(a)." *Id.* at 5.

There are (it's true) two pathways to civil liability under the TVPRA—perpetrator liability and participant liability. But there's only **one** pathway for perpetrator liability—which the Defendants call the "first pathway." *See id.* at 2. The "second pathway," according to the Defendants, "involves three elements: (1) 'the defendant must have participated in a commercial sex trafficking venture'; (2) 'the defendant must have known (or recklessly disregarded) that force, fraud, or coercion would be used in the sex-trafficking venture'; and (3) 'the defendant must have benefited from its participation in the venture.'" *Id.* at 4 (quoting *Doe #1 v. Deutsche Bank Aktiengesellschaft*, 671 F. Supp. 3d 387, 405 (S.D.N.Y. 2023)).

This is all wrong. Although they quote from the court's order in *Deutsche Bank*—which *did* discuss perpetrator liability—the standard they cite is from the court's discussion of "TVP[R]A Participation Liability," not perpetrator liability. *Deutsche Bank*, 671 F. Supp. 3d at 405. In other words, what the Defendants characterize as the "second pathway" to perpetrator liability is what the rest of us call participant liability.

transports, provides, obtains, advertises, maintains, patronizes, or solicits by any means a person[.]" § 1591(a). We'll therefore only consider whether the Plaintiff plausibly alleges that she was "maintained" or "harbored" within the meaning of § 1591(a) because only those two allegations can support a perpetrator-liability claim under the TVPRA.

Here, the Plaintiff plausibly alleges that the Defendants knowingly maintained and harbored her and that they knew (or were in reckless disregard of the fact) that force, threats of force, fraud, or coercion were being used to induce her into commercial sex work. "Although the TVPRA does not define 'harbor[ing,]'" the verb "to 'harbor'" means "'to give shelter or refuge to.'" *Hotels*, 2024 WL 2955728, at *6 (first quoting § 1591; then quoting *Harbor*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/harbor; and then quoting *Safe Harbor*, Black's Law Dictionary 1602 (11th ed. 2019) ("An area or means of protection")). The Plaintiff alleges that, while she was trafficked at the Hotel, staff noticed the clear signs of forced sex trafficking—*e.g.*, "[c]ash payments for the rooms by the sex trafficker," "[e]xcessive used condoms located in the rooms used for sex trafficking," "[e]xcessive requests for towels and linens in the rooms used for sex trafficking," "S.W., scantily clothed, and in visibly impaired condition on the premises," "[p]leas and screams for help coming from the rooms of [the] Plaintiff [ ] and/or those of other women being trafficked," "[m]ultiple men per day coming and going from the same rooms without luggage or personal possessions," and "police and EMS activity at [the Hotel] that was related to commercial sex work." AC ¶¶ 213–15. Despite all this, the Amended Complaint says, the Defendants failed to "[c]onduct internal investigations[,]" "[r]eport suspicious conduct to local law enforcement or federal authorities[,]" "[i]nstruct staff to document or escalate observed trafficking behavior[,]" "[t]rain employees to recognize and respond to trafficking signs[,]" "[r]emove the trafficker from the property or refuse him service[,]" or "[o]ffer any protection, aid, or escape opportunities to [the] Plaintiff[.]" *Id.*

¶ 186; *see also id.* ¶ 212 ("[The] Defendants actively facilitated the trafficking operation by failing to intervene despite clear signs of coercion and abuse."); *id.* ¶ 214 ("[The] Defendants failed to take any steps to prevent trafficking, despite knowledge of ongoing criminal activity at [the Hotel]."); *id.* ¶ 215 ("[The] Defendants acted in reckless disregard of the fact that [the] Plaintiff [ ] was being trafficked, as evidenced by the persistent and obvious red flags observed by [H]otel staff, repeated criminal activity on the premises, and Defendants' deliberate failure to intervene despite their power and obligation to do so.").

"Courts have found that allegations of continued collaboration with traffickers, failure to intervene despite known red flags, and facilitating trafficking conduct can support [ ] a claim" of perpetrator liability. *K.R.D. v. Wyndham Hotels & Resorts, Inc.*, 2025 WL 1166519, at *3 (D.N.J. Apr. 21, 2025) (citing *J.C. v. Choice Hotels Int'l, Inc.*, 2020 WL 6318707, at *4–8 (N.D. Cal. Oct. 28, 2020)); *see also ibid.* ("Despite these allegedly clear red flags, Defendants allegedly failed to investigate, report, or intervene in any way and continued to rent rooms out.").[6] Based on these allegations, the Plaintiff has

---

[6] *See also Ricchio*, 853 F.3d at 556 (Justice Souter) ("In continuing to rent him the room after McLean's conduct was manifest, the Patels knowingly harbored Ricchio at the Shangri–La Motel for the purpose of McLean's object of obtaining her sexual labor or services."); *L.M.H. v. Red Roof Inns*, 2025 WL 961720, at *10 (S.D. Ohio Mar. 31, 2025) ("Construing the allegations in [the] Plaintiff's favor at this stage, this Court concludes that she sufficiently alleges that RRI Defendants knowingly 'harbored' her in violation of § 1591(a)(1) by renting rooms to her traffickers for the purpose of causing Plaintiff, a minor, to engage in commercial sex acts."); *Mouloki v. Epee*, 262 F. Supp. 3d 684, 698 (N.D. Ill. 2017) (concluding that "providing lodging to someone for the purposes of obtaining her labor or services against her will" constitutes "harboring" under the TVPRA); *Doe v. Wyndham Hotels & Resorts*, 2025 WL 85831, at *15 (E.D. Cal. Jan. 7, 2025) (rejecting hotel defendant's "argument that plaintiff's SAC fails to sufficiently allege that she was 'harbored' and [ ] deny[ing] its motion to dismiss perpetrator liability claim as imputed to it through vicarious liability," noting that "hotels can 'harbor' under the TVPRA through the act of renting rooms to a trafficker"); *K.R.D. v. Hilton Worldwide Holdings Inc.*, 798 F. Supp. 3d 1082, 1100 (N.D. Cal. 2025) ("In short, K.R.D. alleges that HLT witnessed obvious signs of her trafficking but nonetheless continued to rent her trafficker a room to house her for more than a year. K.R.D. thus adequately pleads that HLT knowingly harbored her and is liable as a perpetrator. And because K.R.D. pleads that HLT was Hilton's agent, her allegations against HLT are sufficient to allege that Hilton is liable on a perpetrator theory." (collecting cases)).

plausibly alleged that the Defendants knowingly harbored or maintained her with actual knowledge or reckless disregard of the fact that force, threats of force, or coercion would be used to entice her to engage in commercial sex acts.

But our Plaintiff offers much more than just "continued collaboration with traffickers, failure to intervene despite known red flags, and facilitating trafficking conduct[.]" *K.R.D.*, 2025 WL 1166519, at *3. *First*, she says that the Defendants' alleged agent, Fintz, knowingly facilitated the sex trafficking and then shared in the sex-trafficking profits. *See* AC ¶ 217 ("Fintz actively facilitated, profited from, and failed to intervene in [the] Plaintiff's trafficking. He received monetary incentives from traffickers, including per-room and per-victim cuts, and attempted to traffic [H]otel employees himself. These actions were undertaken in the scope of his duties and with the actual or apparent authority granted to him by each Defendant."). Specifically, she claims that Fintz "received monetary kickbacks or 'cuts' from traffickers, including [Joseph], in exchange for permitting continued trafficking operations at the [H]otel," and that "[t]hese incentives included payments per room rented and, in some cases, per trafficking victim." *Id.* ¶ 142, 145. That the Defendants' agent allegedly received kickbacks "in exchange for continued trafficking operations" reasonably suggests that the Defendants "gave shelter" to the Plaintiff *knowing* or in reckless disregard of the fact that she was being trafficked.

*Second*, the Plaintiff claims that the Hotel "host[ed] sex parties at the lobby" and in the Restaurant while allowing her to stay at the Hotel, *id.* ¶ 49, which strongly suggests that the Defendants were harboring her, *see Mouloki v. Epee*, 262 F. Supp. 3d 684, 698 (N.D. Ill. 2017) (holding that "providing lodging to someone for the purposes of obtaining her labor or services against her will constitutes 'harboring'" (citing *Ricchio*, 853 F.3d at 556)); *Hotels*, 2024 WL 2955728, at *6 (denying the motion to dismiss because allegations that the hotel owner "entered into a tacit agreement with [the] [p]laintiff's traffickers to provide them with a room and shelter whereby [the] [p]laintiff could be

trafficked for profit" are "sufficient to state a claim for 'harboring' [the] [p]laintiff under 18 U.S.C. §§ 1591(a), 1595").

*Third*, the Plaintiff alleges that Tropical and EZ rented the traffickers rooms "in close proximity to each other and in proximity to the stairwells and exits" as a way of facilitating "the human sex trafficking enterprise[.]" AC ¶ 118; *see also* Resp. at 14 ("Rooms were rented to [Joseph] . . . near stairwells or exits at his request . . . [to] create[ ] the conditions necessary for trafficking to persist undisturbed."). Courts routinely find that hotel operators who accept cash payments from traffickers, accommodate the traffickers' room requests, and ignore red flags can be liable as perpetrators under the TVPRA. *See K.R.D. v. Hilton Worldwide Holdings Inc.*, 798 F. Supp. 3d 1082, 1100 (N.D. Cal. 2025) ("In short, K.R.D. alleges that HLT witnessed obvious signs of her trafficking but nonetheless continued to rent her trafficker a room to house her for more than a year. K.R.D. thus adequately pleads that HLT knowingly harbored her and is liable as a perpetrator. And because K.R.D. pleads that HLT was Hilton's agent, her allegations against HLT are sufficient to allege that Hilton is liable on a perpetrator theory." (collecting cases)).[7]

---

[7] *See also K.R.D.*, 2025 WL 1166519, at *3 ("According to the [c]omplaint, [p]laintiff was trafficked at the hotel for a period of time, during which hotel staff allegedly observed signs of trafficking — including frequent extended stays, cash payments, refusal of housekeeping, and excessive foot traffic of individuals who were not hotel guests to [p]laintiff's room. . . . These allegations support the inference that Defendants knew or recklessly disregarded the trafficking and enabled it through its continued provision of rooms and services."); *Hotels*, 2024 WL 2955728, at *6 (defining "to 'harbor'" as "to give shelter or refuge to" and denying motion to dismiss perpetrator-liability claim against a hotel that "provide[d]" traffickers with the room where the victim "could be trafficked for profit"); *Doe v. Esa P Portfolio LLC*, 2026 WL 183829, at *6 (D.N.J. Jan. 23, 2026) (finding actual knowledge for perpetrator-liability claim where the "[p]laintiff allege[d] that multiple employees at the Subject ESA Hotel, including management-level employees, observed and/or were made aware of' various 'obvious signs' of [the] [p]laintiff's trafficking" and because the plaintiff identified "various affirmative acts taken by [the] [d]efendants, including the repeated renting of rooms to traffickers and operating in such a manner as to facilitate trafficking"); *J.M.*, 2023 WL 3456619, at *3 ("[The] plaintiff has [sufficiently] pled the knowledge requirement of perpetrator liability: defendant was aware of the trafficker's 'modus operandi,' including the use of force, and was familiar with the trafficker's conduct." (citation omitted)); *L.M.H.*, 2025 WL 961720, at *11 (denying the motion to dismiss where

25

*Fourth*, the Plaintiff alleges that Fintz "regularly provided her with free drink cards for the [Restaurant]." *Id.* ¶ 152. The TVPRA doesn't define the word "maintain," but the verb "to maintain" generally means "to sustain" or "to support or provide for." *Maintain*, Merriam-Webster Dictionary, https://www.merriam-webster.com/thesaurus/maintain; *see also Maintain*, Black's Law Dictionary 1139 (12th ed. 2024) ("To continue (something)"); *Maintain*, Webster's Third New International Dictionary 1362 ("to supply with what is needed" or "to preserve from failure or decline"); *Maintain*, Oxford-English Dictionary, https://dictionary.cambridge.org/dictionary/english/maintain ("To provide (oneself, one's family, etc.) with means of subsistence or the necessaries of life"). So, by averring that the Defendants provided her with free meals and drinks, the Plaintiff has plausibly alleged that they "knowingly maintain[ed]" her.

Resisting this conclusion, the Defendants argue that they didn't know the Plaintiff was a sex-trafficking victim and dispute having harbored her. In their view, the "Plaintiff alleges [H]otel staff may have observed 'red flags' such as cash payments, extended stays, foot traffic, and young women on the property." MTD at 16. But (they say) "[c]ourts hold such allegations insufficient to establish knowledge of sex trafficking." *Ibid.* (first citing *L.M. v. 42 Hotel Raleigh, LLC*, 717 F. Supp. 3d 464 (E.D.N.C. 2024); and then citing *Doe #9 v. Wyndham Hotels & Resorts, Inc.*, 2021 WL 1186333 (S.D.

_____

the plaintiff "allege[d] that RRI St. Louis were familiar with [p]laintiff's traffickers and gave in to requests they 'freely' made 'that would facilitate their trafficking activities without concern for detection or interference'" and "allege[d], for example, that hotel staff accepted cash payments and did not require identification from appropriate parties, allowing traffickers to take steps that would minimize their traceability to law enforcement, . . . and that they provided 'additional services to [p]laintiff's traffickers . . . including but not limited to, internet access, excessive towels, and extra housekeeping services to clean out the evidence of the activities of the trafficking venture once the traffickers vacated'"); *Mouloki*, 262 F. Supp. 3d at 698 (concluding that "providing lodging to someone for the purposes of obtaining her labor or services against her will" constitutes "harboring" under the TVPRA); *Doe*, 2025 WL 85831, at *15 (rejecting hotel defendant's "argument that plaintiff's SAC fails to sufficiently allege that she was 'harbored' and [ ] deny[ing] its motion to dismiss perpetrator liability claim as imputed to it through vicarious liability," noting that "hotels can 'harbor' under the TVPRA through the act of renting rooms to a trafficker").

Tex. Mar. 30, 2021)). Specifically, according to the Defendants, "'harboring' requires an affirmative act to conceal or protect—not merely renting rooms." *Id.* at 14. Three problems with this.

*One*, the two cases the Defendants cite addressed *beneficiary*—*not* perpetrator—liability and are therefore inapposite here. "Section 1595 creates two kinds of civil liability: perpetrator liability and participant liability." *Salesforce*, 76 F.4th at 552. Because perpetrator liability and participant liability require the plaintiff to satisfy two distinct standards, courts analyze them separately. *See Ratha v. Rubicon Res., LLC*, 2026 WL 480006, at *20 (9th Cir. Feb. 20, 2026) (Callahan, J.) ("*Ricchio* has nothing to do with beneficiary liability; it is a case about perpetrator liability."); *Doe v. Scottsdale Inns LLC*, 2024 WL 4664436, at *2, n.1 (D. Ariz. Nov. 4, 2024) ("'Perpetrator liability' is different from 'participant liability,' also known as beneficiary liability" (quoting *Salesforce*, 76 F.4th at 552)); *id.* at *3 (rejecting the plaintiff's argument because it would create "no meaningful distinction between perpetrator liability and beneficiary liability"); *Doe 1 v. Apple Inc.*, 96 F.4th 403, 410 (D.C. Cir. 2024) (Rao, J.) ("The TVPRA explicitly establishes civil liability for perpetrators of forced labor and indirect liability for other knowing participants."). So, the Defendants are left with no support for their position that, in *perpetrator*-liability cases, harboring requires an affirmative act to conceal.

"Under the adversary system, it is counsel's responsibility to explain why these points have legal merit; the Court does not serve as counsel's law clerk." *Sideridraulic Sys. SpA v. Briese Schiffahrts GmbH & Co. KG*, 2011 WL 3204521, at *2 (S.D. Ala. July 26, 2011) (Steele, C.J.) (cleaned up). "On a Rule 12(b)(6) motion to dismiss, '[t]he moving party bears the burden to show that the complaint should be dismissed.'" *Sprint Sols., Inc. v. Fils-Amie*, 44 F. Supp. 3d 1224, 1228 (S.D. Fla. 2014) (Cohn, J.) (quoting *Mendez–Arriola v. White Wilson Med. Ctr. PA*, 2010 WL 3385356, at *3 (N.D. Fla. Aug. 25, 2010) (Rodgers, J.)). "The movant must support its arguments for dismissal with citations to legal authority." *Ibid.* (citing S.D. Fla. L. R. 7.1(a)(1)). "Where a defendant seeking dismissal of a complaint

27

under Rule 12(b)(6) does not provide legal authority in support of its arguments, it has failed to satisfy its burden of establishing its entitlement to dismissal." *Ibid.* (citations omitted). "In short, [we] will not do a party's research for it and, without more, find[ ] the Defendants' position is wholly lacking." *GS Holistic, LLC v. SAM 2016 Inc.*, 2023 WL 2932038, at *3 (S.D. Fla. Apr. 13, 2023) (Scola, J.). We could reject the Defendants' argument on this basis alone.

*Two*, and in any event, the Defendants are wrong on the law. Contra the Defendants' position, courts routinely find that, when hotel staff observe red flags—including cash payments, extended stays, foot traffic, and young women on the property—and then continue to rent hotel rooms to the traffickers, the plaintiff has done enough to survive a motion to dismiss on her harboring claim. *See, e.g.*, *Doe v. Wyndham Hotels & Resorts*, 2025 WL 85831, at *15 (E.D. Cal. Jan. 7, 2025) (rejecting hotel defendant's "argument that plaintiff's SAC fails to sufficiently allege that she was 'harbored' and [ ] deny[ing] its motion to dismiss perpetrator liability claim" because "hotels can 'harbor' under the TVPRA through the act of renting rooms to a trafficker").

*Three*, the Defendants are also wrong on the facts. As we've said, the Plaintiff alleges *far* more than "red flags." She, for example, claims that "Joseph partnered with other local 'pimps' to host sex parties at the lobby of the [Hotel] and [Restaurant], where Johns were then taken into the hotel rooms by [the Plaintiff] and other victims of sex trafficking." AC ¶ 49. She says that "[m]ultiple staff members of the [Hotel] were present at these parties," and that "all were aware of the purpose of these parties[.]" *Ibid.* "[E]ven when they were not hosting a sex party," she adds, "Joseph's other sex trafficking victims would also frequent [the Restaurant] to pick up and/or wait for Johns regularly[.]" *Id.* ¶ 51. This is all in addition to her allegations that Hotel staff observed her, "scantily clothed, and in visibly impaired condition on the premises," heard "[p]leas and screams for help coming from the rooms of [the] Plaintiff, [ ] and/or those of other women being trafficked by Joseph," saw "[m]ultiple men per day

28

coming and going from the same rooms without luggage or personal possessions," and had "[k]nowledge of police and EMS activity at [the Hotel] that was related to commercial sex work." *Id.* ¶ 210. Plus, as to knowledge, she avers that Fintz repeatedly responded to reviews that referenced sex trafficking and violence—showing, at a minimum, reckless disregard for the sex trafficking that was taking place there. The Plaintiff has thus plausibly alleged that the Defendants "knew or [were] in reckless disregard of the fact that . . . means of force, threats of force, fraud, or coercion would be used to cause [the Plaintiff] to engage in a commercial sex act." *Rivera*, 558 F. App'x at 974 (quoting § 1591(a)(2)).

***

We therefore **DENY** the MTD as to Count I.

### III.    Count III: Premise Liability

In Count III, the Plaintiff asserts a "common law premises liability claim" against Tropical and EZ. *See* AC ¶¶ 235–53. A premises-liability claim is a kind of negligence action. "The elements for negligence are duty, breach, harm, and proximate cause; the additional elements for a claim of premises liability include the defendant's possession or control of the premises and notice of the dangerous condition." *Lisanti v. City of Port Richey*, 787 So. 2d 36, 37 (Fla. 2d DCA 2001). The Defendants argue that Count III "should be dismissed both as untimely and for failure to state a plausible claim." MTD at 27 (citing AC ¶¶ 235–53). We disagree (for now).

#### a. The Plaintiff's Claim is Not Time-barred

Statute of limitations is "an affirmative defense, and . . . [the] plaintiff is not required to negate an affirmative defense in its complaint." *La Grasta v. First Union Sec., Inc.*, 358 F.3d 840, 845 (11th Cir. 2004) (citation omitted). "A dismissal for failure to state a claim on statute of limitations grounds is

29

appropriate only if it is apparent from the face of the complaint that the claim is time-barred." *United States ex rel. Hunt v. Cochise Consultancy, Inc.*, 887 F.3d 1081, 1085 (11th Cir. 2018) (cleaned up).

"Under Florida law, the statute of limitations begins to run when the cause of action accrues." *Carnival Corp. v. Rolls-Royce PLC*, 2009 WL 3861482, at *5 (S.D. Fla. Nov. 17, 2009) (Seitz, J.) (citing FLA. STAT. § 95.031). "A cause of action accrues when the last element constituting the cause of action occurs." § 95.031(1). "Under the continuing tort doctrine, the cause of action accrues when the tortious conduct ceases." *Effs v. Sony Pictures Home Ent., Inc.*, 197 So. 3d 1243, 1244 (Fla. 3d DCA 2016) (cleaned up). "A continuing tort is established by continual tortious acts, not by continual harmful effects from an original, completed act." *Id.* at 1245 (cleaned up).

Our Plaintiff alleges that her "sex trafficking . . . began in 2019 and continued through at least December 31, 2020." AC ¶ 236. This allegation is sufficient to invoke the continuing-tort doctrine. *See C.S. v. Wyndham Hotels & Resorts, Inc.*, 538 F. Supp. 3d 1284, 1304 (M.D. Fla. 2021) (Steele, J.) (finding that, where the "plaintiff alleges she was a repeat victim of sex trafficking at the Days Inn Hotel between 2015 and February 2016[,] . . . such allegations [are] sufficient to invoke the continuing tort doctrine"). Her premises-liability claim thus accrued on December 31, 2020—the date on which she was no longer being trafficked. She therefore had until December 31, 2024, to file her claim. But she didn't file her lawsuit until April 1, 2025—*four months* after the statute of limitations had run.[8] *See generally* AC.

---

[8] The Plaintiff also seems to raise the "delayed discovery" doctrine under Florida law. AC ¶ 236 (alleging that the Plaintiff "repressed the memory of her trafficking, and accordingly, the statute of limitations is tolled"); *see also* Resp. at 25 (arguing that "memory suppression is a recognized factual basis for delayed accrual"). "The 'delayed discovery' doctrine generally provides that a cause of action does not accrue until the plaintiff either knows or reasonably should know of the tortious act giving rise to the cause of action." *Hearndon v. Graham*, 767 So. 2d 1179, 1184 (Fla. 2000). In *Hearndon*, the Florida Supreme Court found that the "application of the delayed discovery doctrine to childhood sexual abuse claims is fair given the nature of the alleged tortious conduct and its effect on victims, and is consistent with our application of the doctrine to tort cases generally." *Id.* at 1186. But the

Recognizing that her claim is time-barred, the Plaintiff asks us to engage in equitable tolling. *See* Resp. at 24 ("[The] Plaintiff has alleged facts sufficient to invoke . . . equitable tolling based on excusable delay in discovering her legal rights[.]"). "Equitable tolling is appropriate when a movant untimely files because of extraordinary circumstances that are both beyond his control and unavoidable even with diligence." *Sandvik v. United States*, 177 F.3d 1269, 1271 (11th Cir. 1999). At the motion-to-dismiss stage, a plaintiff "must allege sufficient facts to state a claim for equitable tolling that is 'plausible on its face.'" *Mesones v. Estevez*, 2021 WL 3721324, at *4 (11th Cir. Aug. 23, 2021) (quoting *Twombly*, 550 U.S. at 570). The Plaintiff says that she "repressed the memory of her trafficking, and accordingly, the statute of limitations is tolled." AC ¶ 236.

The Defendants obviously disagree. In their view, "[w]hile Plaintiff claims that she 'repressed her memory' of the abuse, this assertion does not meet the legal standard for equitable tolling." MTD at 28 (quoting AC ¶ 236). "Courts," they say, "routinely reject generalized trauma claims absent specific facts showing extraordinary circumstances that prevented timely filing." *Ibid.* (first citing *Catelyn H. v. G6 Hospitality, LLC*, 2025 WL 929032, at *3 (D. Nev. Mar. 26, 2025); and then citing *C.C. v. Rashid*, 2024 WL 5200543, at *8 (D. Nev. Dec. 20, 2024)). But the Defendants offer no binding Florida or federal cases for their view that the Plaintiff's repressed memory—caused, she says, by the Defendants' wrongful conduct—doesn't justify equitable tolling. So, although this is a close call, "[a] dismissal for failure to state a claim on statute of limitations grounds is appropriate only if it is apparent from the face of the complaint that the claim is time-barred." *Cochise Consultancy, Inc.*, 887 F.3d at 1085 (cleaned

---

"delayed discovery doctrine applies only to intentional tort claims against the perpetrator of the sexual abuse." *W.D. v. Archdiocese of Miami, Inc.*, 197 So. 3d 584, 588 (Fla. 4th DCA 2016) (first citing *Davis v. Monahan*, 832 So. 2d 708 (Fla. 2002); then citing *Cisko v. Diocese of Steubenville*, 123 So. 3d 83 (Fla. 3d DCA 2013); and then citing *Doe v. Sinrod*, 90 So. 3d 852 (Fla. 4th DCA 2012)). Since the Plaintiff is asserting a negligence (not an intentional-tort) claim in this count, she cannot rely on the delayed-discovery doctrine. We'll therefore apply normal continuing-tort principles to determine her claim's accrual date.

up). At this early stage of the case, then, we'll allow the Plaintiff's time-barred negligence claim to proceed on a theory of equitable tolling—but we're admittedly skeptical of this claim's viability and will permit the Defendants to reraise this argument at summary judgment.

### b. The Plaintiff has Plausibly Asserted a Premises-Liability Claim

The "elements for a claim of premises liability include the defendant's possession or control of the premises and notice of the dangerous condition." *Lisanti*, 787 So. 2d at 37. Here, the Plaintiff alleges that "Tropical Paradise and EZ had possession, custody or control" of the Hotel. AC ¶ 242. And (she adds) they "knew or had constructive knowledge, that the women with [the] Plaintiff's sex trafficker, including [the] Plaintiff, [ ] were used to carry out the commercial sex trade[.]" *Id.* ¶ 124.

Tropical and EZ say this isn't enough. The Plaintiff, in their view, neither "identifies [ ] facts showing Tropical Paradise was aware of, or had the ability to prevent, the alleged" sex trafficking nor "plead[s] facts connecting either Tropical Paradise or EZ to actual or constructive knowledge of the alleged criminal conduct." MTD at 26. In saying so, however, the Defendants again ignore the well-pled allegations of the Amended Complaint.

As we've explained, the Amended Complaint repeatedly claims that Tropical and EZ knew (or should have known) of the sex trafficking taking place inside their Hotel. It points to the Plaintiff "being visibly injured, impaired, or fearful while escorted by Joseph," "[m]ultiple men per day coming and going from the same rooms without luggage or personal possessions," "[e]xcessive requests for towels and linens in the rooms," "[e]xcessive used condoms located in the rooms," "[r]efusal of housekeeping services by those persons engaged in sex trafficking," and "[o]nline guest reviews referencing prostitution[.]"AC ¶ 229. Plus, the Plaintiff avers that Fintz "facilitated trafficking on site, received cuts from room rentals associated with trafficking victims, and enabled sex and drug activity to flourish at the [H]otel." *Id.* ¶ 226. And she says that the Hotel hosted "sex parties" in the lobby and

the Restaurant, where "[m]ultiple staff members" who were "aware of the purpose of these parties" were "present[.]" *Id.* ¶ 49. The Plaintiff, in short, has plausibly alleged that EZ and Tropical had "notice" of the sex trafficking in their Hotel. *See S.Y. v. Shivparvti, LLC*, 2021 WL 825048, at *6 (M.D. Fla. Mar. 4, 2021) (Steele, J.) (denying the motion to dismiss the Plaintiff's premises-liability claim where "the Complaint alleges Defendant was on notice of the sex trafficking occurring at the Sunrise Motel and not only failed to prevent it, but knowingly turned a blind eye to it"); *C.S. v. Choice Hotels Int'l, Inc.*, 2021 WL 1966431, at *12 (M.D. Fla. May 17, 2021) (Steele, J.) (denying motion to dismiss where the plaintiff "allege[d] the defendants had actual or constructive knowledge of sex trafficking occurring on the premises, that they knew or should have known the risk of such criminal conduct taking place would be unreasonably high without appropriate precautions, and that they had actual or constructive knowledge of the dangerous conditions plaintiff was in").

We therefore **DENY** the Motion to Dismiss Count III.

\* \* \*

### CONCLUSION

After careful review, we **ORDER and ADJUDGE** that the Defendants' Motion to Dismiss the Plaintiff's Second Amended Complaint [ECF No. 45] is **DENIED**.

**DONE AND ORDERED** in the Southern District of Florida on March 23, 2026.

_____
**ROY K. ALTMAN**
**UNITED STATES DISTRICT JUDGE**

cc:     counsel of record